Affirmed
and Opinion filed September 30, 2009.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00855-CR

NO. 14-07-00856-CR

____________

 

PHILLIP LEE HEAD, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 212th
District Court

Galveston County, Texas

Trial Court Cause Nos. 04-CR1668
& 06-CR0955

 



 

  O P I N I O N

A jury convicted appellant Phillip Lee
Head of misapplication of fiduciary property and assessed punishment at 25
years= confinement and a
$10,000 fine.  The jury also convicted appellant of securities fraud and
assessed punishment at 32 years= confinement and a $10,000 fine. 
Appellant appeals his conviction for misapplication of fiduciary property in
cause number 14-07-00855-CR and his conviction for securities fraud in cause
number 14-07-00856-CR on numerous grounds.  We affirm.

 








Background

A.      Appellant Operates Capital Estate Services and
Guardian Group

Appellant sold annuities and trusts to
senior citizens through his Galveston-based estate planning company, Capital
Estate Services (ACapital@).  Appellant
operated Capital in the front of his office; the back housed Guardian Group, a
telemarketing operation.  Guardian Group telemarketers contacted senior
citizens who responded to informational cards mailed by appellant.  Guardian
Group telemarketers set up appointments for Capital employees to visit seniors
at their homes.  These employees provided investment and estate planning
information to the seniors and attempted to sell trusts and annuities.

Appellant also generated business for
Capital by advertising in newspapers.  The advertisements promoted seminars
sponsored by appellant C a Acertified estate
planner, certified senior advisor, [and] certified wealth transfer practitioner@ with a Amasters
certification in estate planning@ C and his team of
professionals.  Appellant conducted his seminars at hotels and restaurants; the
seminars targeted seniors and included a complimentary lunch or dinner. 

Appellant presented himself at these
seminars as an expert discussing the benefits of avoiding probate through
irrevocable trusts, and the funding of such trusts through annuities. 
Appellant=s employees contacted seniors who attended the
seminars and scheduled home visits with the goal of selling trusts and
annuities to the seniors.  After a senior agreed to establish a trust, the
trust documents were created in appellant=s office using a
format that was set up on the office computer and then reviewed by an
attorney.  Appellant=s employees delivered the trust documents
to the seniors. 

 

 

 








B.      Appellant Joins Wintford Verkin to Create Retriever
Equity Fund

Appellant hired attorney Wintford Evans
Verkin, Jr.,[1]
in 2000, to provide legal services and assist appellant in creating trusts for
his clients.  

Verkin accompanied appellant to Austin in
2000 or 2001,  to gather information about two companies C Old South Trust
and Collins Financial.  Appellant had been selling Old South Trust stock to his
Capital clients before he teamed up with Verkin.

 Old South Trust and Collins Financial
were engaged in a joint venture under which  Old South Trust raised investment
money by selling stock, and Collins Financial used the money to buy distressed
assets such as bulk credit card debt and delinquent education loans.  Appellant
and Verkin visited Collins Financial at its Austin headquarters to learn how
the company operated.  After the first trip with appellant, Verkin continued
investigating Collins Financial and Old South Trust.  By then, appellant and
Verkin had decided to set up a business modeled after Old South Trust.  

Verkin traveled to Murphysboro, Tennessee,
and met with the CEO of Old South Trust and each of its division heads to learn
about its organization and operation, and its agreements with Collins
Financial.  Based on this information, appellant and Verkin decided to form
Retriever Equity Fund, Incorporated (ARetriever@).  They
contemplated that Verkin would organize Retriever and manage it.  Appellant
would receive 50 percent of Retriever=s profits through
a service agreement between Retriever and an entity called RPH C another company
owned by appellant.  








Appellant=s role was to
raise money for Retriever and bring in investors through his successful
business at Capital.  Appellant and his employees C in particular,
Rita Brychta and John Drake C induced appellant=s Capital clients
to switch their investments from Old South Trust to Retriever.  According to
Retriever=s private placement memorandum, which was modeled
after Old South Trust=s private placement memorandum, money from
investors who contributed to Retriever would be invested in distressed assets.

Verkin=s role was to
manage Retriever=s day-to-day operations and keep records
for the investors in return for a $150,000 annual salary.  Verkin selected most
of Retriever=s investments.  He wrote all of the checks on behalf
of Retriever and made deposits.  Appellant had no access to the two bank
accounts Verkin handled for Retriever.  According to Verkin, appellant and
Verkin both knew how Retriever operated and what Retriever was doing.  Verkin
and appellant talked about Retriever four to five times a day. 

Retriever=s original
articles of incorporation were filed on December 31, 2001. Appellant instructed
his employees to contact Capital clients who previously had bought trusts,
annuities, or Old South Trust stock and tell them about Retriever.  

Within weeks of Retriever=s incorporation,
Verkin realized that Retriever was undercapitalized and needed tens of millions
of dollars to be economically feasible.  In January or February 2002, Verkin
told appellant that Retriever needed millions more in capital.  Verkin told
appellant that Retriever would not invest in distressed assets, and asked
appellant to start looking at other investment opportunities.  Verkin also told
appellant that he would explore investing in litigation.  Appellant told Verkin
that he would increase the frequency of his seminar presentations to attract
more investors.  Appellant and Verkin never discussed informing potential
investors that, in fact,  Retriever would not be investing in distressed assets
as represented in the private placement memorandum.








Appellant received no payment under the
service agreement between Retriever and RPH.  However, appellant received
multiple loans from Retriever between 2002 and 2003 totaling more than
$700,000  C paid to appellant individually or to his companies C under a loan
participation agreement.  Appellant also was paid a 10 percent commission on
the money Capital clients invested in Retriever; his commissions totaled nearly
$370,000 between January 2002 and April 2004.  

Retriever never invested in distressed
assets as originally contemplated.  Instead, Retriever invested in personal
injury litigation pursued by Verkin=s law firm and
another law firm.  Retriever also funded a litigation matter referred to as AMedallion@ in the Bahamas;
other Retriever investments included a loan participation agreement with RPH
for several hundred thousand dollars, real property in Galveston County,
certificates of deposit, promissory notes, and a judgment.

Numerous seniors cashed in their savings,
retirement funds, or annuities to invest in Retriever.  Several investors
incurred substantial surrender penalties after cashing in their annuities and
other investments, but were told that the losses would be offset by a bonus
from Retriever.  Seniors invested more than $3.7 million in Retriever between
2001 and 2004.  By 2005, Retriever=s assets were
worth $450,000.  Retriever was in receivership by the time of appellant=s trial.

The evidence at trial showed that Brychta,
one of appellant=s Capital employees, started selling
Retriever stock to several seniors in 2002.  Brychta learned about Retriever
from appellant, who told her that it was fashioned after Old South Trust. 
Appellant also told Brychta that appellant and Verkin talked about Retriever
being Aa good plan@ for Capital
clients and Asomething they could make a good income off of.@  Brychta talked
to Verkin about Retriever so she could inform clients about where their funds
would be invested.  Verkin explained to Brychta that Retriever would invest in
credit card debt and distressed real estate properties which then would be Arehabbed@ and sold. 








Appellant instructed Brychta to visit
Capital clients and induce them to invest in Retriever.  As instructed by
appellant and Verkin, Brychta told clients that Retriever invested in credit
card debt and foreclosed homes.  Brychta did not know C and never told
clients C that Verkin and
appellant were borrowing money from Retriever; that Verkin had filed for
bankruptcy in 1994; or that Retriever had used previous investors= funds for
purposes other than buying distressed assets. 

Brychta and appellant discussed how
Retriever would make up any losses clients incurred from annuity surrender
charges, and appellant explained that Retriever would issue a bonus in the form
of additional Retriever shares.  Accordingly, investors who incurred a
withdrawal penalty were told that Retriever would offset for the penalty.       

By 2004, Brychta knew that appellant had
gone into bankruptcy in May 2003, but she did not tell clients about the
bankruptcy.  She failed to disclose that a cease and desist order had been
entered by the Texas State Securities Board against her and appellant.  Brychta
also failed to disclose that a consent judgment was entered against appellant,
RPH, and Guardian Group in Iowa pursuant to the Iowa Consumer Fraud Act.  This
judgment enjoined appellant and his named companies from soliciting in AIowa or directing
toward Iowa consumers transactions involving timeshares.@  

Several of the seniors who lost the money
they invested in Retriever also testified at trial.  Donald Long, Mabel Milsted
Silverstein, Wallace Thornton, Anna Weber, and Harvey Birdwell confirmed that
they had been Capital clients and had invested in Retriever after talking to
Brychta or Drake, another Capital employee.  These investors were told that
Retriever would invest in distressed assets.   They testified that they did not
know Retriever invested in litigation and made loans to appellant and Verkin. 
They also testified  that they would not have invested in Retriever had they
known Retriever would not buy distressed assets; that Retriever would make
loans to appellant and Verkin; or that Verkin had filed for bankruptcy. 








Jennifer Sedwick, a financial analyst for
the Texas State Securities Board, also testified at trial.  She investigated
Retriever, appellant, and Verkin.  She reviewed Retriever=s bank records and
financial documents for the time period from January 1, 2002 to November 30,
2005.  Sedwick concluded that 41 percent of Retriever=s funds went to
Verkin, his companies or his family; 15 percent went to some of the investors
in monthly or quarterly dividends; 9 percent went to the law firm of Bryant and
Bouman in loans; 2 percent went to Verkin for personal expenses; 6 percent went
to people Sedwick was unable to identify; and 19 percent went to appellant
personally or to his companies.

C.      Appellant Establishes Trusts for Gladys Theall

In addition to his other activities,
appellant also handled all of 87-year-old Gladys Theall=s investments
after her husband died.  Appellant set up two identical trusts for Theall in
July 1999 C the JET and GPT  trusts.  These two trusts were set
up for the benefit of their certificate holders.  Theall was the sole trust
certificate holder and investor for both trusts.

Marianne Clark and Russell Peterson were
appointed as original trustees of JET, and Marianne Clark and Norman Weiler
were appointed as original trustees of GPT.  There was evidence at trial that
appellant was designated as the Atrust protector@ of the two trusts
and that he had authority to appoint trustees of these trusts.

Appellant fired the original trustees and
appointed Verkin as trustee of the trusts in March 2001.  Verkin liquidated the
trusts= annuities and
invested the money in Retriever.  After the trusts= annuities had
been liquidated and the money invested in Retriever, appellant and Verkin
visited Theall at her nursing home.  They persuaded her to approve the
investment of the trusts= money in Retriever and waive Aany conflict of
interest issues@ arising from Verkin=s ownership
interest in Retriever.    

Theall understood that Retriever would
give her a yearly dividend check at 13 percent interest, but she did not know
how Retriever was investing the money.  Theall did not know that appellant and
Verkin previously had declared bankruptcy; she received this information only
after her Amoney had disappeared.@  Theall also did
not know that a judgment had been entered in Iowa against appellant arising
from a lawsuit involving time shares; that appellant and Verkin would receive
loans out of her investment in Retriever; or that Retriever loaned money to
fund litigation. 








Theall=s niece, Maryann
Broussard, took care of Theall=s monthly bills and medical needs.  She
spoke with Verkin by telephone in March or April 2001.  After Verkin became
trustee, Broussard stopped receiving statements on the annuities.  When she
questioned what had happened to the money invested in the annuities, Verkin
responded that he could not discuss Theall=s affairs with
Broussard.  Broussard hired attorney Michael Guarino to find out what happened
to the trusts= annuities.  She was informed that the trusts incurred
substantial surrender penalties for cashing in the annuities, and that $2.3
million from these annuities had been invested in Retriever.

D.      Appellant
is Indicted, Tried, and Convicted of Securities Fraud  and Misapplication of
Fiduciary Property


The State indicted appellant for
securities fraud, alleging in pertinent part that appellant engaged in fraud in
connection with the sale and offer for sale of Retriever stock to 22
specifically named investors.  The indictment alleged that appellant knowingly
and intentionally

$ misrepresented that funds invested
to purchase Retriever stock would be used to acquire distressed asset
portfolios; 

$ failed to disclose that Verkin,
the president and the chief operating officer of Retriever, filed for Chapter 7
bankruptcy on or about October 19, 1994;

$ failed to disclose that funds paid
by previous Retriever shareholders to purchase  distressed asset portfolios
were used for other purposes;

$  failed to disclose that investor
funds paid to purchase Retriever shares would be used to make a loan to
appellant or a corporation in which appellant had an interest; 

$ failed to disclose that the
Attorney General of Iowa sued appellant on or about June 11, 2002, alleging
that appellant violated the Consumer Fraud Act; and that on or about July 4, 2003,
appellant signed a consent judgment enjoining him from soliciting consumers to
pay him money in connection with the marketing, sale, or any other transfer of
a time share; 

$ failed to disclose appellant filed
for Chapter 11 bankruptcy on or about May 19, 2003;








$ failed to disclose that the Texas
Securities Commission issued an agreed cease and desist order against appellant
on or about January 21, 2004, finding that he violated the registration
requirement for the Texas Securities Act in connection with his offer for sale
and sale of certificates of deposit.    

The State also indicted appellant for
misapplication of fiduciary property.  The indictment alleged that appellant
intentionally, knowingly, and recklessly misapplied $200,000 or more, which he
held as a fiduciary, contrary to the agreements under which he held the
property.  The indictment further alleged that such misapplication involved
substantial risk of loss to Gladys Theall, an elderly individual and the owner
of the trust property.   The indictment further alleged that appellant
misapplied the property for his own benefit; failed to preserve the property by
incurring unreasonable penalties for surrendering assets; misrepresented the
types of investments made; failed to disclose his personal interest in and
other material facts related to the investment at the time the investments were
made; failed to give a proper accounting and paid himself and/or others
excessive and unreasonable commissions and fees; invested in the property in a
manner that was not prudent or reasonable; failed to act in good faith; failed
to deal fairly with Theall; and/or failed to fully restore the property to
Theall upon demand.

After hearing the witnesses= testimony and
viewing all the evidence presented, the jury was instructed that it could find
appellant guilty if it determined he acted alone, or alternatively, if he acted
as a party with Verkin.  The jury convicted appellant of securities fraud, and
assessed punishment at 32 years= confinement and a $10,000 fine.  The jury
also convicted appellant of misapplication of fiduciary property and assessed
punishment at 25 years= confinement and a $10,000 fine. 

Analysis

A.      Legal and Factual Sufficiency








In reviewing legal sufficiency of the
evidence, an appellate court will examine the evidence in the light most
favorable to the verdict to determine whether any rational fact finder could
have found the essential elements of the offense beyond a reasonable doubt. Jackson
v. Virginia, 443 U.S. 307, 319 (1979); Salinas v. State, 163 S.W.3d
734, 737 (Tex. Crim. App. 2005).  The court does not sit as a thirteenth juror
and may not re‑evaluate the weight and credibility of the record evidence
or substitute its judgment for that of the fact finder.  Dewberry v. State,
4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

Reconciliation of conflicts in the
evidence is within the exclusive province of the fact finder.  See Mosley v.
State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998) (en banc). The appellate
court=s duty is not to
re‑weigh the evidence, but to serve as a final due process safeguard
ensuring only the rationality of the fact finder.  See Williams v. State,
937 S.W.2d 479, 483 (Tex. Crim. App. 1996).

When conducting a factual sufficiency
review, an appellate court must determine (1) whether the evidence introduced
to support the verdict is Aso weak@ that the fact
finder=s verdict seems Aclearly wrong and
manifestly unjust,@ and (2) whether, considering conflicting
evidence, the fact finder=s verdict is nevertheless against the
great weight and preponderance of the evidence.  Watson v. State, 204
S.W.3d 404, 414‑15 (Tex. Crim. App. 2006).  We view the evidence in a
neutral light in a factual sufficiency review.  Johnson v. State, 23
S.W.3d 1, 11 (Tex. Crim. App. 2000) (en banc).

In order to declare that an evidentiary
conflict justifies a new trial, an appellate court must rely on some objective
basis in the record demonstrating that the great weight and preponderance of
the evidence contradicts the jury=s verdict.  See
Lancon v. State, 253 S.W.3d 699, 706‑07 (Tex. Crim. App. 2008).  An
appellate court should not intrude upon the fact finder=s role as the sole
judge of the weight and credibility of witness testimony.  Vasquez v. State,
67 S.W.3d 229, 236 (Tex. Crim. App. 2002).

The jury may choose to believe or
disbelieve any portion of the testimony.  See Lancon, 253 S.W.3d at
707.  Due deference must be given to the fact finder=s determinations
concerning the weight and credibility of the evidence, and reversal of those
determinations is appropriate only to prevent the occurrence of a manifest
injustice.  Martinez v. State, 129 S.W.3d 101, 106 (Tex. Crim. App.
2004).








1.       Securities Fraud

In his third issue, appellant argues that
the evidence is legally and factually insufficient to support his conviction
for securities fraud. 

The Texas Securities Act was enacted to
regulate the sale of securities and to protect the public from fraud by persons
engaged in selling securities.  See Shields v. State, 27 S.W.3d 267, 273
(Tex. App.CAustin 2000, no pet.).  Article 581‑29(C)(1)
prohibits the use of fraud or fraudulent practices in connection with the sale
or offer for sale of securities.  Tex. Rev. Civ. Stat. Ann. art. 581-29(C)(1)
(Vernon Supp. 2008).  The term Asecurity@ or Asecurities@ includes stock.  Id.
art. 581-4(A) (Vernon Supp. 2008).  The terms Asale@ and Aoffer for sale@ include every
disposition or attempt to dispose of a security for value.  Id. art.
581-4(E) (Vernon Supp. 2008).  The term Asale@ also includes
agreements whereby securities are sold for money, or any transfer in trust or
otherwise.  Id.  The term Asell@ means any act by
which a sale is made, and the term Asale@ or Aoffer of sale@ includes a
solicitation of sale, an attempt to sell, or an offer to sell, directly or
indirectly by an agent or salesman.  See id.

The term Afraud@ or Afraudulent
practice@ means any
intentional failure to disclose a material fact and any misrepresentations, in
any manner, of a material fact.  See id. art. 581-4(F) (Vernon Supp.
2008).  A fact is A>material= if there is a
substantial likelihood that it would have assumed actual significance in the
deliberations of a reasonable investor, in that it would have been viewed by
the reasonable investor as significantly altering the total mix of available
information used in deciding whether to invest.@  See Birdwell
v. State, 804 S.W.2d 900, 904 (Tex. Crim. App. 1991).








The jury also was instructed on the law of
parties.  A person is criminally responsible as a party to an offense if the
offense is committed by his own conduct, by the conduct of another for which he
is criminally responsible, or by both.  Tex. Penal Code Ann. ' 7.01(a) (Vernon
2003).  A person is criminally responsible for an offense committed by the
conduct of another if, acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense.  Id. ' 7.02(a)(2)
(Vernon 2003).  

Appellant contends on appeal that the
evidence is legally and factually insufficient to support his securities fraud
conviction because it does not establish that he failed to inform investors
that (1) Retriever was using their funds for investments other than distressed
assets; (2) prior investor funds were used for investments other than
distressed assets; (3) Verkin had filed for bankruptcy; (4) a cease and desist
order had been issued by the Securities Commissioner of Texas; (5) a lawsuit
had been filed by the Iowa Attorney General alleging appellant violated the
Consumer Fraud Act; (6) appellant had filed for personal bankruptcy; and (7)
appellant received loans from Retriever.

Because seven alternative means of
committing securities fraud were submitted to the jury in the disjunctive,
proof of any one alternative means is sufficient for conviction.  Martinez v.
State, 129 S.W.3d at 106; Brooks v. State, 990 S.W.2d 278, 283 (Tex.
Crim. App. 1999); see also Kitchens v. State, 823 S.W.2d 256, 258 (Tex.
Crim. App. 1991); Hawkins v. State, 656 S.W.2d 70, 73 (Tex. Crim. App.
1983).  Additionally, because the jury returned a general verdict finding
appellant guilty of securities fraud, we may uphold the verdict if the evidence
is sufficient to prove appellant committed the offense either as a primary
actor or as a party.  Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim.
App. 1992); see also Brooks, 990 S.W.2d at 283.  








We conclude that the evidence in this case
supports a finding that appellant failed to inform investors that Retriever was
using their funds for investments other than in distressed assets.  Retriever=s private
placement memorandum stated that Retriever would invest in distressed assets. 
Verkin testified that he realized within weeks of Retriever=s incorporation
that it was undercapitalized and needed tens of millions of dollars.  In
January or February 2002, Verkin told appellant that Retriever would need
millions more to buy enough distressed assets to be profitable.[2]


Verkin told appellant that Retriever would
not be investing in distressed assets and to start looking at other investment
opportunities.  Retriever=s asset portfolio introduced at trial
showed that Retriever never invested in distressed assets.  Rather, Retriever=s portfolio showed
investments in personal injury litigation pursued either by Verkin=s law firm or
another law firm.  Retriever also funded a litigation matter referred to as AMedallion@ in the Bahamas;
entered into a loan participation agreement with RPH for several hundred
thousand dollars; and owned real property in Galveston County, certificates of
deposit, promissory notes, and a judgment.  Verkin also testified that,
although he selected most of Retriever=s investments,
appellant and Verkin both knew how Retriever operated and what Retriever was
doing.  

The evidence also showed that appellant=s company RPH  had
a service agreement with Retriever.  Under the agreement, Retriever agreed to
retain RPH Ato evaluate, collect, manage, and liquidate distressed
assets in conjunction with Retriever.@  RPH would
receive 50 percent Aof all profits [Retriever] realized in the
liquidation of the distressed assets.@  According to
Verkin, Retriever and RPH were partners and that fact was disclosed in
Retriever=s private placement memorandum.  Verkin explained that
the memorandum=s business purpose section disclosed that RPH has Athe full authority
to go out and find distressed assets even on their own.  That they can go about
the business of collecting and acquiring and checking those assets.@

Although appellant was not paid anything
under the service agreement, appellant was paid a 10 percent commission on the
money investors invested in Retriever.  Appellant was paid approximately
$367,000 in commissions on investments clients made in Retriever.








Capital employee Brychta testified that
she learned about Retriever from appellant.  Generally, appellant instructed
Brychta to visit Capital clients and induce them to invest in Retriever. 
Brychta=s first sale of
Retriever stock was to senior Mabel Milsted Silverstein, a client who
previously established a trust through Capital.  After Silverstein=s husband died in
2002, she sold her house for $150,000 and appellant instructed Brychta to visit
Silverstein and induce her to invest the house sale proceeds in Retriever.  As
instructed by appellant and Verkin, Brychta told Silverstein that Retriever invested
in credit card debt and foreclosed homes.  Brychta never told Silverstein, or
any of her other clients, that Verkin and appellant were borrowing money from
Retriever, or that Verkin had filed for bankruptcy in 1994.  

Silverstein testified that she met Brychta
through Capital after attending appellant=s seminar with her
husband.  After Silverstein=s husband died, she sold her home for
$150,000.  She invested the sale proceeds in Retriever in January 2002, after
Brychta and Verkin visited her home and encouraged her to invest.  Silverstein
never saw Retriever=s private placement memorandum, nor did
Verkin or Brychta ask her to read anything before she signed documents and
invested in Retriever.  Silverstein testified that she felt vulnerable after
her husband=s death, and that she trusted Brychta and Verkin. 
Silverstein understood that the money she invested in Retriever would be used
to buy credit card debt; she would not have invested in Retriever had she known
it made loans to appellant and Verkin.








Appellant also sent Brychta to visit
72-year-old Harvey Birdwell, another senior who had established a trust through
Capital, and introduce him to Retriever.  Birdwell testified that appellant
delivered trust documents to his home on August 23, 2000.  Thereafter,
appellant offered Birdwell annuities, and Birdwell invested $112,000 in an annuity. 
Later, Brychta came to Birdwell=s house to replace some pages on his trust
document and introduce him to Retriever.  She explained that Retriever bought
depressed companies= assets and then sold them at a profit. 
In June 2002, Birdwell invested $25,000 in Retriever.  He received a private
placement memorandum, but he did not read it until after Brychta left his
house.  Brychta did not disclose to Birdwell that Retriever would make loans to
appellant and Verkin; that Verkin had filed bankruptcy in 1994; or that
Retriever would fund personal injury lawsuits.  Birdwell testified that if he
had known Aabout the bankruptcy,@ he would not have
invested in Retriever.  In 2003 or 2004, appellant himself visited Birdwell and
offered to sell him Retriever stock, but Birdwell declined.    

Appellant also sent Brychta to visit
70-year-old Lulah Brown to deliver her trust document and discuss investing in
Retriever.  After Brychta explained that Retriever invested in credit card debt
and distressed real estate, Brown withdrew money she had invested in
certificates of deposit and invested it in Retriever.  Brown incurred a
withdrawal penalty, but was told that Retriever would offset it by providing a
better interest rate.  Brychta and appellant discussed how Retriever would make
up any loss clients would incur from annuity surrender charges, and appellant
explained that Retriever would issue a bonus in the form of additional
Retriever shares.

In January 2004, appellant and Brychta
discussed selling Retriever stock to Mr. McCollum, who was in his late
seventies.  Brychta met with McCollum and told him Retriever was financing
personal injury lawsuits.  At that time, Brychta inquired if Retriever was
still investing in distressed assets and Verkin informed her that Retriever was
financing lawsuits.  McCollum invested in Retriever on January 23, 2004.  By
that time, Brychta knew that appellant had gone into bankruptcy in May 2003,
but she did not tell McCollum about the bankruptcy.  She also failed to
disclose to McCollum that a cease and desist order had been entered by the
Texas State Securities Board against appellant and Brychta.  

When Brychta=s last client,
Gloria Leisure, invested in Retriever in March 2004, Brychta failed to disclose
appellant=s bankruptcy, the State Securities Board=s cease and desist
order, and that appellant and Verkin had received loans from Retriever. 
Brychta also failed to disclose that a consent judgment was entered against
appellant, RPH, and Guardian Group in Iowa pursuant to the Iowa Consumer Fraud
Act, enjoining appellant and his named companies from soliciting in AIowa or directing
toward Iowa consumers transactions involving timeshares.@








  Gloria Leisure testified that Brychta
contacted her about investing in Retriever after she received an inheritance. 
Brychta did not tell her what Retriever would use her money for; Brychta told
Leisure only that ARetriever would pay good interest.@  Leisure invested
$37,200 in March 2004.  Leisure testified that she never saw Retriever=s private
placement memorandum or Retriever=s application and
subscription agreement, and that Brychta asked Leisure to sign only one
document.  Leisure testified that she would have liked to have known how her
money would be invested by Retriever.  She did not know about the State
Securities Board action and the Iowa judgment; nor did she know that Verkin and
appellant filed for bankruptcy, or that Retriever invested in lawsuits.  She
testified that she would not have invested in Retriever had she known appellant
and Verkin had filed for bankruptcy and were Adoing things that
they wasn=t [sic] supposed to.@

In January 2005, Brychta informed Leisure
that there was a problem with Leisure=s investment. 
Later, Brychta called Leisure to tell her that the problem was greater than she
anticipated and advised Leisure to call appellant.  When Leisure contacted
appellant, he was rude and told her that he had been arrested and that the
money was gone.  Appellant told Leisure not to call Brychta, but to call him
instead.  However, Leisure could not reach appellant.

Brychta also testified that Drake, who
died before trial began, repeatedly told her that appellant and Verkin were Adoing some very
bad things@ and that Drake Awas caught in the
middle.@  He advised her
to Arun far away.@  Brychta
testified that Drake left Capital in late 2003, after he had been disciplined
for sexual harassment; he then went to work for Verkin at Retriever.  Brychta
continued working for appellant at Capital.  She testified that, until
appellant=s arrest, both appellant and Verkin assured her that
they were taking care of her clients. 








Donald Long testified that he met
appellant=s employee Drake in January 2002.  Drake introduced
him to Retriever and visited Long several times.  Long cashed in his annuities
to invest in Retriever.  Long never received Retriever=s private
placement memorandum or any other document describing Retriever=s investment
plans.  Long understood that Retriever would purchase credit card debt.  He
testified that he would not have invested in Retriever had he known that it
would not buy credit card debt and that Verkin filed for bankruptcy in 1994. 
Long testified that he did not know that Retriever invested in litigation and
made loans to appellant and Verkin.

Wallace Thornton testified that Brychta
introduced him to Retriever in 2002, when she came to his home to review his
trust.  Brychta explained that Retriever bought and liquidated small
companies.  Brychta showed Thornton a private placement memorandum, but he was
not allowed to keep it.  When he invested $176,000 in Retriever three months
after his wife died, he lost $23,000 in the transaction.  Brychta assured him
that Verkin would make up for the loss by issuing stock in that amount to
Thornton.  Thornton received Retriever=s private
placement memorandum months later, but he did not understand it.  Thornton was
not told that Verkin had filed for bankruptcy or that appellant and Verkin received
loans from Retriever.

Anna Weber testified that she attended
appellant=s seminar after receiving a card in the mail.  After
the seminar, Drake visited Weber and her husband to talk about trusts.  The
Webers bought a trust in 2001.  Drake then introduced them to Retriever, and
they invested approximately $115,000 in Retriever in 2002.  The Webers never
saw a private placement memorandum, even though Anna asked for one because they
wanted to know what they were investing in.  Drake explained that Retriever was
a brand new fund and that it did not have time to print a prospectus.  Drake
told the Webers that Retriever invested in buying houses, fixing them up, and
reselling them.  Based on this information, the Webers invested in Retriever. 
They did not know that RPH had a service agreement with Retriever and that RPH
was appellant=s company.  The Webers also did not know that Verkin
had filed for bankruptcy and that appellant and Verkin would receive loans from
Retriever.  Weber testified that she and her husband would not have invested in
Retriever had they known about these facts.








Appellant argues that this evidence is
insufficient to prove that he failed to inform investors that Retriever was
using their funds for investments other than distressed assets because
Retriever=s private placement memorandum was Adelivered to all
investors [and] clearly and unequivocally indicated REF could invest in any
asset it saw fit.@  Therefore, he contends, all investors
were on notice their funds would not necessarily be invested in distressed
property.  Appellant also argues that the evidence is insufficient because
Brychta=s testimony Aclearly indicates
. . . many of the investors were told of the risks involved and not all of the
investments would be in distressed assets.@  Appellant
stresses that his brother Robert Head, an experienced investor, testified on
appellant=s behalf that Retriever=s private
placement memorandum was not unusual or improper.

Contrary to appellant=s assertion, the
evidence establishes that several investors never saw Retriever=s private
placement memorandum or did not have a chance to read it before they invested
in Retriever.  Long, Silverstein, Weber, and Leisure testified that they never
saw a Retriever private placement memorandum.  Birdwell testified that he
received a private placement memorandum but did not read it until Brychta left
his house.  And Thornton testified that, although Brychta showed him a private
placement memorandum, he was not allowed to keep it and received one only
months later.  Therefore, these investors were not alerted  by Retriever=s private
placement memorandum that Atheir funds were not necessarily going to
be invested in distressed property.@

Appellant also asserts that Brychta told
many investors that Anot all of the investments would be in distressed
assets.@  The evidence
shows that Brychta told only McCollum that Retriever also financed lawsuits.   









Further, Robert Head=s testimony
regarding Retriever=s private placement memorandum does not
undermine the jury=s finding.  Investors failed to receive
the private placement memorandum or did not receive it before investing.  Long,
Silverstein, Thornton, Weber, and Birdwell were told that Retriever would
invest in distressed assets when appellant and Verkin already knew in January
2002 that Retriever would not invest in distressed assets.

The evidence establishes that appellant and
Verkin jointly decided to set up Retriever.  Appellant=s role in
Retriever was to raise money and bring in investors through his successful
business at Capital, while Verkin=s role was to
manage Retriever=s day-to-day operations and keep records
for investors.  Although appellant had no authority to write Retriever=s checks and
Verkin selected most of Retriever=s investments,
Verkin testified that appellant and Verkin both knew how Retriever operated and
that they talked about Retriever four to five times a day.

The evidence also shows that appellant
instructed Brychta to sell Retriever stock without informing her that Retriever
would not be investing in distressed assets as he originally told her and as
represented by Retriever=s private placement memorandum.  Even
though Verkin informed appellant a month or two after Retriever=s incorporation
that Retriever would not be investing in distresses assets, appellant never
shared this information with Brychta so that she could inform potential investors.

Under the applicable standard of review,
the evidence is legally sufficient to support appellant=s conviction for
securities fraud.  Viewing the evidence in a neutral light, we hold that the
evidence is not so weak or so contrary to the preponderance of the available
evidence as to make the finding of guilt clearly wrong or manifestly unjust. 
Therefore, the evidence is factually sufficient to support appellant=s securities fraud
conviction.  Accordingly, we overrule appellant=s third issue.

3.       Misapplication of Fiduciary Property

In his first two issues, appellant
contends that the evidence at trial is legally and factually insufficient to
support his conviction for misapplication of fiduciary property. 








A person commits the first-degree felony
of misapplication of fiduciary property if he intentionally, knowingly, or
recklessly misapplies property he holds as a fiduciary in a manner that
involves substantial risk of loss to the owner of the property; and the value
of the property misapplied is $200,000 or more, and the offense was committed
against an elderly individual.  See Tex. Penal Code Ann. ' 32.45(b),(c)(7),
(d) (Vernon Supp. 2008). 

 A Afiduciary@ includes a
trustee; and any other person acting in a fiduciary capacity; and an officer,
manager, employee, or agent carrying on fiduciary functions on behalf of a
fiduciary.  See id. ' 32.45(a)(1)(A),
(C), (D) (Vernon Supp. 2008).  AMisapply@ means to deal
with property contrary to an agreement under which the fiduciary holds the
property.  See id. ' 32.45(a)(2)(A)
(Vernon Supp. 2008).  AOwner@ means a person
who has title to the property, possession of the property, whether lawful or
not, or a greater right to possession of the property than the actor.  See
id. ' 1.07 (a)(35)
(Vernon Supp. 2008).

The jury also was instructed on the law of
parties.  A person is criminally responsible as a party to an offense if the
offense is committed by his own conduct, by the conduct of another for which he
is criminally responsible, or by both.  Tex. Penal Code Ann. ' 7.01(a).  A
person is criminally responsible for an offense committed by the conduct of
another if, acting with intent to promote or assist the commission of the
offense, he solicits, encourages, directs, aids, or attempts to aid the other
person to commit the offense.  Id. ' 7.02(a)(2).

Theall testified at trial that she and her
husband Jack met appellant after they set up a trust so that Jack=s daughters and
Theall=s niece and nephew
would receive money following their deaths.  At that time, appellant
accompanied another person who delivered the Thealls=s trust document. 
When Jack died, Theall moved to a nursing home in Texas City and her niece,
Broussard, took care of Theall=s financial affairs.  Appellant handled
all of Theall=s investments after her husband died.  Theall
testified that she trusted appellant to handle her investments.








Theall testified that appellant set up the
JET and GPT trusts for her.  The trusts were set up for the benefit of its Acertificate
holders,@ and Theall was
the trust certificate holder and Ainvestor.@  As prescribed by
the trusts, the original trustees agreed to perform their duties as set out in
the trusts and pledged Atheir best efforts and interest to
managing, preserving, and protecting the assets of [the trusts] for the benefit
of the Certificate Holder.@  Exercising his authority as Atrust protector,@ appellant fired
the original trustees and appointed Verkin as trustee of the trusts in March
2001. 

Theall testified that appellant and Verkin
visited her at her nursing home when Broussard was not in town to ask her to
sign two letters.  According to Theall, appellant believed that Verkin should
handle her affairs because Broussard did not live in town.  Appellant and
Verkin convinced her to sign the two letters they brought.  One letter was
dated November 20, 2002, and stated that Theall agreed to dismiss Broussard as
the trustee of the AJack E. Theall, Jr. and Gladys P. Theall
Charitable Remainder Trust  dated the 11th day of September, 1997@; this letter
appointed Verkin to serve as trustee.[3] 
The second letter was dated November 18, 2002, and provided in pertinent part:

The following is an update of my
Trustee report of September 04, 2002.

As reported previously, net annuity
amounts have been received . . . .  These funds have been invested with
Retriever Equity Fund, Inc. . . . .  Retriever Equity Fund, Inc.* granted a
bonus on the investment in the full amount of any surrender charges, so that
there is no penalty.

I continue to maintain a cash
reserve account in excess of $100,000 in order to provide necessary expenses
you may require as an expense of the trust.  If necessary the reserve account
can be increased.

*Retriever Equity Fund, Inc. is a
broad investor based fund that actively invests in distressed assets.  I have
an ownership interest in Retriever and I respectfully request that you approve
and consent to this investment by the Trusts and waive any conflict of interest
issues.  Please sign below to evidence your approval and consent.

I continue to receive questioning
from [Broussard=s] husband about your investments
and money.  I have honored your instructions not to discuss these investments
except with you.  . . .

I authorize and consent.

[Theall=s signature]








Theall testified that she understood
Retriever would give her a yearly dividend check at a 13 percent interest rate,
but she did not know how Retriever was investing money.  Theall testified that
she did not know that appellant and Verkin had declared bankruptcy; she
received this information only after her Amoney had
disappeared.@  Theall also testified that she did not know a
judgment had been entered in Iowa against appellant regarding time shares; that
appellant and Verkin would receive loans out of her investment in Retriever; or
that Retriever loaned money to fund litigation. 

Broussard testified that she took care of
Theall=s monthly bills
and medical needs.  She also testified that Theall=s assets consisted
mainly of stocks and bonds, and that appellant sold these assets for annuities
to set up the JET and GPT trusts.  According to Broussard, Theall called
appellant Aher financial guy.@  Broussard
regularly received statements regarding annuities and kept records for Theall. 


Broussard spoke with Verkin over the
telephone in March or April 2001, because appellant wanted to introduce her to
the trusts= new trustee.  Appellant explained that he Awanted to go back
to Texas with a hometown fellow.@  After Verkin
became trustee, Broussard stopped receiving statements on the annuities; when
she questioned appellant about the lack of statements, appellant told her to
contact Verkin because he was taking care of the trusts now.

After Broussard sent a letter to Verkin
asking about what had happened to $2.3 million the trusts had invested in
annuities, Verkin responded that he could not discuss Theall=s affairs with
Broussard.  Broussard hired attorney Michael Guarino to find out what happened
to the trusts= annuities; she was informed that $2.3 million from annuities
had been invested in Retriever.








With regard to Theall and the trusts,
Verkin testified that appellant told him the trusts needed a trustee and the
original trustees had been fired.  There was evidence that appellant was Atrust protector@ of the trusts,
that he appointed Verkin as trustee of the trusts, and that he introduced
Verkin to Theall and Broussard.  According to Verkin, appellant told him he had
met with Theall and she had agreed to liquidate the trusts= annuities and to
invest the funds in Retriever.  After appellant=s proposal to
Theall, Verkin liquidated $2.3 million in annuities, placed the funds in
Retriever, and paid commissions to appellant.  Verkin did not ask if Theall
wanted to invest the funds in Retriever until after they already had been
invested.  

Verkin testified that he became concerned
about whether Theall Aknew what she was doing@ because Broussard
started inquiring about the status of the trusts.  Verkin testified that he and
appellant first visited Theall at her nursing home in September 2002, to
explain which annuities had been cashed in and how the funds had been
invested.  They visited Theall again in November 2002 and explained that Verkin
had an interest in Retriever.  According to Verkin, Theall seemed to understand
Verkin  had an interest in Retriever and  Theall signed a letter acknowledging
her approval.  Verkin confirmed that the trusts were to be managed for the
benefit of the trusts= certificate holder, and that Theall was
the certificate holder.  Verkin testified that he absolutely considered himself
a fiduciary C a person charged with preserving and protecting his
client=s interest.

Attorney Michael Guarino testified that
Theall and Broussard contacted him because they were concerned about the state
of the JET and GPT trusts; they understood that annuities had been liquidated
but they did not know where the money went.  Guarino testified that the
surrender penalty on the first cashed in annuity was $139,305.54 C about thirty
percent of the policy value.  The remaining annuities also were cashed in and
resulted in similar losses.  Guarino testified that Verkin breached his
fiduciary duty by engaging in self-dealing instead of acting for the sole
benefit of the trusts= beneficiary.  Guarino also was concerned
about timing: Verkin issued Retriever stock to the trusts between January and
September 2002, before Theall consented to the investment in November 2002.








Guarino explained that under both trusts,
the trustees pledged Atheir best efforts and interest in managing,
preserving and protecting the assets of the trust for the benefit of the
certificate holders of the family trust which are the beneficiaries.@  Guarino
testified that the certificate holder of each trust is Theall.

Guarino further testified that appellant
enabled Verkin to gain control of the trusts= funds by
appointing him as trustee.  According to Guarino, appellant violated his
fiduciary duty by failing to protect the trusts and by engaging in
self-dealing.  Guarino testified that appellant engaged in self-dealing when he
accepted loans from Retriever.        

Appellant argues in his first issue that
the evidence is legally insufficient to support his conviction for
misapplication of fiduciary property because the State failed to prove that (1)
he was a fiduciary of the JET and GPT trusts; and (2) Theall owned the trusts.

In his brief, appellant makes no argument
and provides no applicable authority to support his assertion that he was not a
fiduciary of the trusts.  After stating that the term A>fiduciary= includes an
officer, manager, employee, or agent carrying on fiduciary functions on behalf
of a fiduciary,@ appellant asserts that Athe record is
clear [a]ppellant was neither the trustee nor a fiduciary of the trusts.@   In the same
conclusory manner, appellant asserts that the charging instrument Astates [a]ppellant
held a fiduciary relationship with Ms. Theall, again a charge that is clearly
in contradiction with the facts presented at trial.@ 

Even if appellant had sufficiently briefed an argument that
the evidence is legally
insufficient to prove he was a fiduciary of the JET and GPT trusts, this
argument does not support a reversal of the trial court=s judgment.  Presuming for the sake
of argument that the evidence is legally insufficient in this regard, this
court would not reverse appellant=s conviction because, as discussed
below regarding the second issue, the evidence is sufficient to support
appellant=s conviction under the law of parties, and appellant is not required to
be a fiduciary of the trusts to be convicted under the law of parties. 
Therefore, appellant=s argument that the evidence is legally insufficient to prove
he was a fiduciary of the trusts does not support the appellate relief that he
seeks.  








Appellant also contends that the evidence
is legally insufficient to show that Theall owned the trusts= property. 
Appellant contends that Awhen a valid trust is created, the
beneficiaries become the owners of the equitable or beneficial title to the
trust property and are considered the real owners.@  Therefore,
appellant argues that Theall=s niece Broussard is the real owner of the
trusts= property as the
beneficiary of the trusts.  According to appellant, Theall was merely the
investor or grantor of the trusts.

This contention fails because there is no
evidence to suggest that Broussard was the beneficiary of the JET or GPT
trusts.  According to the trusts= language, the
beneficiary of the trusts is the certificate holder; and Theall was the
certificate holder of both trusts.  Thus, Theall was the beneficiary of both
trusts. 

Additionally, Guarino testified that
Theall is the owner and beneficiary of the JET and GPT trusts.  Guarino further
explained that, according to the trusts= language,
trustees Aare pledging their best efforts and interest in
managing, preserving and protecting the assets of the trust[s] for the benefit
of the certificate holders of the . . . trust which are the beneficiaries.@  Guarino
testified that Theall is the certificate holder of both trusts.

Viewing this evidence in the light most
favorable to the verdict, we conclude that it is legally sufficient to show
that Theall was an Aowner@ of the trusts
within the meaning of the penal statute under which appellant was convicted. 
We conclude that the evidence is legally sufficient to support appellant=s conviction for
misapplication of fiduciary property.  Accordingly, we overrule appellant=s first issue.

In his second issue, appellant contends
that the evidence is factually insufficient to prove he is guilty of
misapplication of fiduciary property.  








As stated above, a person commits the
first-degree felony of misapplication of fiduciary property if he
intentionally, knowingly, or recklessly misapplies property he holds as a
fiduciary in a manner that involves substantial risk of loss to the owner of
the property; and the value of the property misapplied is $200,000 or more, and
the offense was committed against an elderly individual.  See Tex. Penal
Code Ann. ' 32.45(b),(c)(7),
(d).

The charge authorized the jury to convict
appellant as a primary actor or as a party if the evidence showed that
appellant acted with intent to promote or assist the commission of the offense
by Verkin by encouraging, directing, aiding, or attempting to aid Verkin to
commit the offense.  See Tex. Penal Code Ann.' 7.02(a)(2).  Because the jury returned a
general verdict finding appellant guilty of misapplication of fiduciary
property, we may uphold the verdict if the evidence is sufficient to prove
appellant committed the offense either as a primary actor or as a party.  Rabbani,
847 S.W.2d at 558; see also Brooks v. State, 990 S.W.2d at 283.

Appellant claims the evidence is factually
insufficient because (1) A[a]ppellant had no knowledge regarding the
on goings of [Retriever], no access to the bank accounts and was not privy to
Mr. Verkin=s conduct relating to investment decisions;@ and (2) A[a]ppellant could
not have misapplied funds because he never possessed, directed, nor controlled
the funds.@ 

The evidence here shows that appellant and
Verkin jointly decided to set up Retriever because it provided them an
opportunity to make a good income.  After appellant and Verkin set up
Retriever, there was evidence that appellant, acting as the Atrust protector@ of the JET and
GPT trusts, appointed Verkin as trustee of both trusts.  At that time, the bulk
of the trusts= assets was placed in annuities with various insurance
companies.  Verkin testified at trial that appellant told him he met with
Theall and she had agreed to liquidate the trusts= annuities so they
could be invested in Retriever.  Verkin testified that he did not propose to
Theall that the trusts= funds be put in Retriever.  Verkin did
not meet with Theall regarding investments in Retriever until September 2002,
at which time $2.3 million in annuities already had been liquidated and
invested in Retriever. 








Verkin also testified that appellant knew
when Verkin cashed in each annuity.  Appellant C as the agent who
sold the trusts= annuities C was notified by
the insurance companies Abecause in each instance insurance
companies go through what is called a preservation effort . . . to try to keep
you from cashing@ in the annuity.  Appellant received a
commission each time an annuity was liquidated and borrowed money from
Retriever each time an annuity was liquidated.

Verkin further testified that he and
appellant visited Theall at her nursing home in September 2002 to explain the
status of the trusts= investments, what annuities had been
cashed in, and how they had been invested.  Verkin testified that in November
2002, they visited Theall again to explain that Verkin had an interest in
Retriever.  Theall confirmed that Verkin and appellant visited her in November
at her nursing home (when Broussard was out of town) to ask Theall to sign two
letters.  

At the time appellant and Verkin visited
Theall to convince her to approve the trusts= investments in
Retriever, appellant knew Retriever would not invest in distressed assets
because Verkin had told him so.  Nevertheless, appellant convinced Theall to
(1) sign a letter stating that Retriever actively invested in distressed
assets; and (2) agree to the investment.








Evidence that appellant had no access to
Retriever=s bank accounts does not establish that he Ahad no knowledge
regarding the on goings of@ Retriever.  Verkin testified that he
realized within weeks of Retriever=s incorporation in
December 2001, that Retriever was undercapitalized and needed tens of millions
of dollars to be economically feasible.  In January or February 2002, Verkin
told appellant that Retriever would need millions more to buy enough distressed
assets to be profitable.  Verkin told appellant that Retriever would not be
investing in distressed assets, and asked appellant to start looking at other
investment opportunities.  Verkin also told appellant that he would explore
investing in litigation.  Appellant responded that he would increase the
frequency of his seminar presentations to attract more investors.  Verkin also
testified that, although he selected most of Retriever=s investments,
appellant and Verkin both knew how Retriever operated and what Retriever was
doing. 

Although appellant was not paid under the
service agreement, appellant was paid a 10 percent commission on the money
investors invested in Retriever.  Appellant was paid more than $200,000 in
commissions for the money the JET and GPT  trusts invested in Retriever.

Steven Schulz, an attorney and
court-appointed receiver for Retriever, testified that appellant contacted him
several times in the two years before trial and was helpful in providing
information about Retriever.  Appellant gave Schulz better information than
Verkin did about the AMedallion@ case Retriever
funded. 

This evidence supports a finding that
appellant encouraged and aided Verkin in misapplying the trusts= property and
therefore was guilty as a party. Viewing all of the evidence in a neutral
light, the evidence supporting the verdict is not so weak or so contrary to the
preponderance of the available evidence as to make the finding of guilt clearly
wrong or manifestly unjust.  The evidence is factually sufficient to sustain
appellant=s conviction.  Accordingly, we overrule appellant=s second issue.

B.      Jury Charge

In his fourth issue, appellant argues that
the trial court erred by submitting a charge to the jury on the offense of
misapplication of fiduciary property that contained a broader claim than was
authorized by the indictment.  Appellant argues that the indictment alleged he
misapplied property he held as a Afiduciary, to-wit:
as a trustee,@ but the application paragraph in the jury charge
merely stated that appellant misapplied property he held as a Afiduciary.@  Appellant
contends that the jury charge Aallowed the jury to convict [a]ppellant
under a different theory and allowed the jury to find [a]ppellant guilty if
they believed him to be a fiduciary of the trusts.@  Appellant
contends that this error caused him egregious harm.  








Implicit in appellant=s argument is his
assumption that the operative indictment is the  March 2006 re-indictment for
misapplication of fiduciary property.  The March 2006 indictment contains the
language Afiduciary, to wit: as trustee.@  The State
contends that the March 2006 indictment was amended and no longer was the
operative indictment.  The State argues that the amended indictment deleted the
word Atrustee@ from the March
indictment, and that the jury charge comported with this amended indictment.

We first consider whether the March
indictment was amended and, thus, ceased to be the operative indictment in this
case.  The latest pronouncement on how an indictment may be effectively amended
is found in Riney v. State, 28 S.W.3d 561, 565-66 (Tex. Crim. App. 2000). 
Riney overruled Ward v. State, 829 S.W.2d 787 (Tex. Crim. App.
1992), which held that Athe only effective means of accomplishing
an amendment was by interlineation; the actual, physical alteration of the face
of the charging instrument.@  Id. at 565-66.  

In Riney, the State filed a motion
to amend just before trial asking to change the name of the substance alleged
and the amount allegedly possessed by the defendant in the indictment.  Id.
at 563.  The State attached to its motion a photocopied duplicate of the first
page of its copy of the indictment; the trial court granted the State=s motion  Id. 
The photocopy was interlineated, but the record did not reveal who physically
interlineated that photocopy.  Id.  The record revealed that the trial
court read the changes into the record, and that the amended copy was
incorporated into the court clerk=s file.  Id. 
The trial court asked defense counsel and the defendant whether they had any
objections to the amendments, and both replied they had no objections.  Id. 
The trial court then formally arraigned the defendant by reading from the
amended indictment in open court, to which the defendant pleaded Anot guilty.@  Id. at
564. 








On appeal, the defendant argued that the
indictment was amended improperly because only a photocopy of the State=s indictment C and not the
original indictment C was interlineated.  Id.  The Court
of Criminal Appeals disagreed and held that the amendment was effective.  Id.
at 564-65.  The court stated that Arequiring physical
interlineation of the original [indictment] as the only means to accomplish an
amendment is unwarranted.  Physical interlineation is an acceptable but not
exclusive means of effecting an amendment to an indictment.@  Id. at
565.  The court also stated that Aresolutely
clinging to the notion that an amendment can be accomplished only by the
physical interlineation of the original indictment provides a defendant with
the opportunity to subvert the process of which he was fully aware and had
affirmatively acknowledged.@  Id. at 565 (emphasis in
original).     We do not read Riney to say that interlineation of a copy
is the only effective way to amend an indictment.  Riney identified one
set of circumstances under which an indictment effectively was amended.  See
id. at 566.  The court considered that A[w]hen the State
produced a copy of the original indictment, it was interlineated and
incorporated into the court clerk=s file, all with
appellant=s specific knowledge and express approval.@  Id. at
566.

Appellate courts have applied Riney=s rationale in
circumstances in which amendments were accomplished by means other than
interlineation on a copy of the indictment.  In Westmoreland v. State,
174 S.W.3d 282, 285-87 (Tex. App.CTyler 2005, pet.
ref=d), the court held
that an indictment effectively was amended when (1) the State filed a motion to
amend the indictment which contained the language of the original indictment
and the requested amending language; (2) the defendant was present at the
hearing on the motion to amend, had notice of the intended amendment, and did
not object to the amendment; and (3) the order granting the motion to amend included
the amended language.  Id. at 287.  The court held that the order was
sufficient to put the defendant on notice of the amended language in the
indictment.  Id.  

In Aguilera v. State, 75 S.W.3d 60,
64 (Tex. App.CSan Antonio 2002, pet. ref=d), the court held
that the amendment to an indictment was effective where the trial court granted
the State=s motion to amend the indictment and issued an order
restating the language from the original indictment in its entirety with the
amendment.  Id.








In Harrison v. State, No.
05-07-00453-CR, 2008 WL 2514333, at *1 (Tex. App.CDallas June 25,
2008, no pet.) (mem. op. , not designated for publication), the court held that
the indictment was effectively amended where the record showed that (1) the
State=s motion to amend
contained a copy of the amended indictment language; (2) an order granting the
amendment was signed by the trial court; (3) the defendant did not object to
the method of amendment used; (4) the defendant affirmed that he had reviewed
the indictment and understood the charges against him; and (5) the defendant
waived arraignment and reading of the indictment.  Id.  The court also
stated, A[w]e interpret
Riney as allowing flexibility in amending indictments provided that the
method of amendment employed produces an amended copy of the indictment
incorporated into the record under the direction of the trial court sufficient
to give the defendant fair notice of the charges.@  Id.

In Barnes v. State, No.
03-03-00533-CR, 2007 WL 1647827, at *2 (Tex. App.CAustin June 7,
2007, pet. ref=d) (mem. op., not designated for publication), the
court held that an indictment can be amended under Riney by
incorporating into the trial court=s file a separate
document containing the text of the amended charging language.  Id.  The
court concluded that the indictment effectively was amended because the clerk=s record contained
the original information, the State=s motion to amend
specifically setting out the proposed amendment, and the court=s order
specifically setting out the amended language.  Id.

Under Riney, an interlineation on
the original or a copy of the indictment is not the only acceptable method of
accomplishing an amendment.  Nevertheless, Riney teaches that the
language of the amended indictment must be memorialized in a written document
and the amendment must be granted by the trial court.  See Riney, 28
S.W.3d at 565-66; see also Westmoreland, 174 S.W.3d at 285-87;
Aguilera, 75 S.W.3d at 64.        








Here, the State filed its motion to amend
the indictment several months before trial began.  The trial court did not sign
an order granting the State=s motion.  Before voir dire on June 11,
2007, the State announced on the record that, although no order had been signed
granting its motion to amend, appellant agreed to the amendment in February. 
According to the State, appellant agreed to the amendment if the State agreed
to his continuance.  Appellant did not deny the agreement.  After this
discussion, the trial court did not sign an order granting the State=s motion to
amend.  The trial court never manifested an intention to grant the State=s motion to amend;
nor did the trial court state that it was amending the indictment.

The State=s written motion
to amend the indictment containing the requested amending language is not
sufficient to accomplish an amendment when there is no indication in the record
that the trial court granted the State=s motion to amend.[4] 
Accordingly, we agree with appellant that the operative indictment was the 2006
indictment containing the Afiduciary, to-wit: as a trustee@ language.    

We next address appellant=s assertion that
he was egregiously harmed by the trial court=s failure to
submit a jury charge that referred to appellant merely as fiduciary.  We review
a claim of jury‑charge error using the procedure set out in Almanza v.
State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).  Barrios v. State,
283 S.W.3d 348, 350 (Tex. Crim. App. 2009).  

The first step is to determine whether
there is charge error.  Id.  If there was error and appellant objected
to the error at trial, reversal is required if the error is calculated to
injure the defendant=s rights C meaning there
must be some harm to the defendant from the error.  Id.  If the
appellant did not object at trial, the error must be Afundamental,@ and reversal is
required Aonly if the error is so egregious and created such
harm@ that the
defendant did not have a fair and impartial trial.  Sakil v. State, 287
S.W.3d 23, 25-26 (Tex. Crim. App. 2009) (quoting Almanza v. State, 686
S.W.2d at 171). 








We determine Aegregious harm@ by examining the
entire jury charge; the state of the evidence, including the contested issues
and weight of the probative evidence; the arguments of counsel; and any other
relevant information revealed by the record of the trial as a whole. Warner
v. State, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). The appellant must
have suffered actual rather than theoretical harm.  Id.

Here, the jury charge tracked the
indictment=s language but omitted the phrase Ato-wit: as a
trustee@ relating to
fiduciary.  Appellant argues that the charge Aexpanded upon the
allegations in the indictment@ and allowed the jurors to convict him of
misapplication of fiduciary property Aif they believed
him to be a fiduciary@ but not a trustee.  

A defendant is to be tried only on the
crimes alleged in the indictment.  Abdnor v. State, 871 S.W.2d 726, 738
(Tex. Crim. App. 1994).  The jury charge may not enlarge the offense alleged
and authorize the jury to convict a defendant on a basis or theory permitted by
the jury charge but not alleged in the indictment.  See Reed v. State,
117 S.W.3d 260, 265 (Tex. Crim. App. 2003); Castillo v. State, 7 S.W.3d
253, 258-59 (Tex. App.CAustin 1999, pet. ref=d).  Accordingly,
the trial court erred in improperly broadening the indictment by failing to add
the phrase Ato-wit: as a trustee@ relating to
fiduciary.  See Reed, 117 S.W.3d at 265; Castillo, 7
S.W.3d at 258-59.

Because appellant did not object to the
charge, we next examine whether he was egregiously harmed by the trial court=s error.  Warner,
245 S.W.3d at 461.  Appellant contends that he was egregiously harmed because
there is no evidence that he was a trustee.








Appellant=s argument fails
because he was charged under the law of parties.  Accordingly, he was
criminally responsible for misapplication of fiduciary property committed by
Verkin if, acting with intent to promote or assist the commission of the
offense, he solicited, encouraged, directed, aided, or attempted to aid Verkin
commit the offense.  See Tex. Penal Code Ann. ' 7.02(a)(2).  If the trial court had
tracked the indictment language and added the language Ato wit: as a
trustee@ to the jury
charge in the section relating to appellant=s own conduct as a
principal, then the court also would have added the Ato wit: as a
trustee@ language in the
section relating to Verkin=s conduct and appellant=s responsibility
as a party for Verkin=s conduct.  

 Verkin testified that he pleaded guilty
to the offense of misapplication of fiduciary property because he was in fact
guilty.  Appellant appointed Verkin as trustee of the JET and GPT trusts. 
Verkin testified that he liquidated all of the trusts= annuities and
invested the money in Retriever.  This investment caused an immediate loss in
surrender penalties.  Verkin never asked Theall if she wanted to invest in
Retriever until after he had made the investment.  After the trusts=s annuities had
been liquidated and the money had been invested in Retriever, Verkin and
appellant persuaded Theall to approve Retriever investments and waive Aany conflict of
interest issues@ arising from Verkin=s ownership of
Retriever.  

The evidence establishes that Verkin
misapplied the trusts= property he held as a trustee in a manner
that involved substantial risk of loss to Theall, the owner of the trusts= property. 
Further, the evidence shows that appellant, with the intent to promote or
assist the commission of the offense of misapplication of fiduciary property,
encouraged, directed, or aided Verkin to commit this offense.  

Appellant=s role with
respect to Retriever was to raise money.  Within weeks of Retriever=s incorporation,
Verkin told appellant that Retriever would not invest in distressed assets as
originally contemplated and asked appellant to start looking at other
investment opportunities.  Verkin testified that appellant told him that he met
with Theall, and that she agreed to liquidate the trusts= annuities and
invest the funds in Retriever.  After appellant proposed the Retriever
investment to Theall, Verkin liquidated $2.3 million in annuities and placed
the funds in Retriever.  Appellant collected a commission each time Verkin
cashed in the trusts= annuities.








Verkin testified that he became concerned
about whether Theall Aknew what she was doing@ because Broussard
started inquiring about the status of the trusts.  Verkin testified that he and
appellant visited Theall in September 2002 to explain which annuities had been
cashed in and how the funds had been invested.  Appellant and Verkin visited
Theall again in November 2002.  According to Theall, appellant believed Verkin
should handle all of her affairs.  Theall testified that appellant and Verkin
convinced her to sign a letter approving the investment in Retriever.

Based on this evidence, we conclude that,
even if the trial court had added the Ato wit: as a
trustee@ language in the
jury charge, there is sufficient evidence that appellant, with the intent to
promote or assist trustee Verkin, encouraged, directed, or aided Verkin to
commit the offense of misapplication of fiduciary property.  Accordingly, we
cannot conclude that the charge error caused appellant egregious harm requiring
reversal.  We overrule appellant=s fourth issue.

C.      Continuance

In his fifth issue, appellant contends
that the trial court committed reversible error when it denied a June 4, 2007
motion to continue the June 11, 2007 trial.

The denial of a motion for continuance
rests within the trial court=s sound discretion.  Renteria v. State,
206 S.W.3d 689, 699 (Tex. Crim. App. 2006).  A defendant must show Aspecific prejudice
to his defense@ to establish that the trial court abused its
discretion in refusing to grant a continuance.  Id.  Examples of
specific prejudice include unfair surprise, an inability to effectively cross‑examine
witnesses, and the inability to elicit crucial testimony from potential
witnesses.  Janecka v. State, 937 S.W.2d 456, 468 (Tex. Crim. App.
1996).  No abuse of discretion is shown based on an assertion that counsel did
not have time to investigate adequately for potential mitigating evidence when
there is no showing of harm.  Heiselbetz v. State, 906 S.W.2d 500, 512
(Tex. Crim. App. 1995).








Appellant contends on appeal that the
trial court abused its discretion by denying his June 4, 2007 motion for
continuance because his Atrial counsel had no information the trial
was set for June 11, 2007@ and therefore was unprepared to file Aappropriate
motions relating to the charging instruments.@ 

The record does not support appellant=s assertion that
his trial counsel was unaware of the June 11, 2007 trial setting.  Before trial
began, appellant testified that he attended a pretrial hearing on June 4, 2007,
to which he brought a motion for continuance his trial counsel had given him on
June 3, 2007 to present to the court.  Trial counsel prepared the motion for
continuance, in which he acknowledged that trial was set for June 11, 2007. 
Therefore, appellant=s trial counsel knew of the June 11, 2007
trial setting. 

Appellant also contends he was prejudiced
by the denial of the June 4, 2007 continuance motion because he had no
opportunity to obtain Ainformation regarding certain bank
accounts@ from Verkin, who
exercised his right to remain silent until he pleaded guilty on April 18,
2007.  Appellant contends these bank accounts would have assisted his trial
counsel in showing that (1) Verkin was the sole manager of Retriever funds; (2)
Verkin misappropriated funds and used them to pay for personal expenses; (3) AVerkin had not
been completely truthful@ about the amounts of money he had
obtained, locations of the monies, and the use of monies; and (4) appellant had
no knowledge of Verkin=s spending. 








On April 19, 2007, appellant=s trial counsel
received notice that Verkin had pleaded guilty on April 18, 2007.  By the time
Verkin pleaded guilty, appellant=s trial counsel
had filed six motions for continuance.  Each motion alleged different grounds. 
Appellant=s trial counsel filed another motion for continuance
on April 23, 2007, requesting an order continuing the scheduled trial setting
of April 30, 2007 in light of Verkin=s guilty plea. 
Because Verkin waived his Fifth Amendment privilege against self-incrimination
when he pleaded guilty, appellant=s trial counsel
asked that Verkin be required to provide the State with a Acomplete
accounting with supporting financial records, of all expenditures made with
investors= funds including those funds deposited in foreign
accounts in Nicosia, Cyprus which the State claims it unsuccessfully attempted
to obtain through the Hague Convention or other international process.@  Trial counsel
also claimed that he Amust now fully investigate fifty specific
financial transactions listed in the indictment in order to prove  his innocence
and to trace the control and beneficial enjoyment of the funds.@  Trial counsel
further claimed that a continuance was necessary to allow him A[t]o interview
Verkin and other witnesses and to >further
investigate the matters pertaining to Verkin=s proposed
testimony.=@

The subject of appellant=s complaint on
appeal is the trial court=s denial of his eighth motion for
continuance filed on June 4, 2007.  In the eighth motion, trial counsel argued
that the lack of complete discovery prevented him from adequately preparing for
trial until October 15, 2007.  Trial counsel claimed that Athe State is in
the position to demand and enforce full disclosure from its alleged witnesses
concerning the whereabouts of any missing records,@ and that missing
financial records include transfer of funds offshore to a bank in Nicosia,
Cyprus by Verkin or companies he controlled.  Trial counsel also claimed that,
if appellant were forced to go to trial before resolution of his bankruptcy
case, Ahe will be denied
potential exculpatory evidence which destroys the State=s case against
him.@

On June 11, 2007, the trial court heard
argument before trial began on the June 4, 2007 motion for continuance. 
Appellant=s trial counsel argued that he had not received any
documents relating to bank accounts in Cyprus to which $600,000 had been
diverted.  He argued that it was essential for him Ato know how these
funds were spent because . . . [appellant] is accused of misapplying funds. 
And part of the theory of the misapplication is that . . . [appellant]
benefitted from the funds personally.@  Trial counsel
argued that the State was required to provide him with exculpatory evidence showing
what Verkin spent on himself and his family.








The State responded that it had produced
about 4,000 documents in June 2006, and had provided another 400 documents to
appellant=s trial counsel thereafter, including every check
written by Retriever, and anything the State intended to use at trial.  The
State also argued that trial counsel was free to subpoena any records he
needed.  Appellant testified that he told his trial counsel about several bank
account numbers a few months before trial so that his trial counsel could
obtain records.

The trial court questioned trial counsel
about why he had not filed a motion to compel or a motion for discovery and set
it for hearing before trial.  Trial counsel stated that he communicated only
with the State.  The trial court also noted that trial counsel had months to
find out what he needed to prepare for trial and that he knew since April that
Verkin had pleaded guilty.

This record shows that trial counsel had
several months to obtain the bank account information if he deemed it necessary
for appellant=s defense.  The evidence also shows that trial counsel
had almost two months from the time he learned that Verkin had pleaded guilty
to obtain any information he deemed necessary with respect to Acertain bank
accounts@ he now claims
could have assisted him at trial.

Appellant fails to explain how he was
prejudiced by not obtaining Ainformation regarding certain bank
accounts.@  Appellant argued that these bank accounts would have
shown that Verkin managed all Retriever funds and that Verkin misappropriated
funds to pay for his personal expenses.  However, even without this bank
account information, the evidence showed that Verkin=s role was to
manage Retriever and that Verkin misappropriated funds and used them to pay for
personal expenses.  Verkin himself testified to that effect at trial.  

These circumstances demonstrate that trial
counsel did not need these bank accounts to show Verkin managed Retriever and
spent Retriever money for personal expenses.  Further, the evidence showed that
appellant was aware of Retriever=s dealings and
investments.  Appellant does not explain how information relating to Acertain bank accounts@ could have
established that he Ahad absolutely no information or knowledge@ regarding how
Verkin spent Retriever funds.  








Additionally, appellant questioned
Retriever=s court-appointed receiver at trial regarding a
$600,000 check that went to a bank in Cyprus.  The receiver, Schulz, testified
that he asked attorney John Campbell to look into whether the check that went
to Cyprus was related to Retriever.  Campbell told Schulz that the $600,000
check that went to Cyprus had nothing to do with Retriever.  Appellant also
questioned Schulz about six different bank account numbers, but Schulz did not
recognize any of the account numbers as having any connection to Retriever. 

We conclude that appellant failed to
establish that he was prejudiced by the trial court=s denial of
appellant=s eighth motion for continuance.  We overrule
appellant=s fifth issue. 

D.      Ineffective Assistance of Counsel Claim

In his sixth issue, appellant argues that
he should be granted a new trial because he was denied effective assistance of
counsel.

To prevail on an ineffective assistance
claim, appellant must show that: (1) his trial counsel=s performance fell
below an objective standard of reasonableness; and (2) there is a reasonable
probability that, but for the error, the result of the proceeding would have
been different.  Wiggins v. Smith, 539 U.S. 510, 521, 534 (2003); Cannon
v. State, 252 S.W.3d 342, 348-49 (Tex. Crim. App. 2008).  Appellate review
of trial counsel=s representation is highly deferential and
presumes that counsel=s actions fell within the wide range of
reasonable and professional assistance. Garza v. State, 213 S.W.3d 338,
348 (Tex. Crim. App. 2007).








If the reasons for counsel=s conduct at trial
do not appear in the record and it is at least possible that the conduct could
have been grounded in legitimate trial strategy, we will defer to counsel=s decisions and
deny relief on an ineffective assistance claim on direct appeal. Id. To
warrant reversal where trial counsel has not been afforded an opportunity to
explain those reasons, the challenged conduct must be A>so outrageous that
no competent attorney would have engaged in it.=@  Roberts v.
State, 220 S.W.3d 521, 533‑34 (Tex. Crim. App. 2007), cert. denied,
128 S. Ct. 282 (2007) (quoting Goodspeed v. State, 187 S.W.3d 390, 392
(Tex. Crim. App. 2005). A vague, inarticulate sense that counsel could have
provided a better defense is not a legal basis for finding counsel
constitutionally deficient.  Bone v. State, 77 S.W.3d 828, 836 (Tex.
Crim. App. 2002).

Appellant primarily relies on Cannon
v.  State, 252 S.W.3d at 348-350, to support his contention that Atrial counsel=s performance in
this matter was ineffective per say [sic]@ and that trial
counsel was completely unprepared.  In that regard, appellant claims his trial
counsel was ineffective because (1) he Aattempted to ask
for a continuance explaining that he did not know he was going to trial on
June11, 2007;@ (2) he was not Aphysically present
at the two last court settings;@ (3) appellant notified trial counsel that
trial was set for June 11, 2007; (4) counsel admitted he was not familiar with
six bank accounts which allegedly related to Verkin and his activities, and
this ignorance prevented trial counsel from cross-examining Verkin; (5) trial counsel
did not know which charging instrument would be used at trial; (6) the trial
court had to Atell trial counsel he needed to file a motion
designating punishment option;@ and (7) trial counsel admitted that he
was not experienced in criminal cases.








The present case is distinguishable from Cannon. 
In Cannon, defense counsel refused to participate in the two-day
jury trial.  252 S.W.3d at 350.  After the trial court denied defense counsel=s motions for
continuance and recusal, counsel declared that he was not ready for trial, that
he was unable to effectively represent his client, and that he therefore would
not participate in the trial.  Id.  Defense counsel declined to (1)
participate in jury selection; (2) enter a plea for his client; (3) make an
opening or closing statement; (4) cross-examine any of the State=s witnesses; (5)
make any objections; (6) offer any defense; (7) request any special jury
instructions; or (8) offer any evidence or argument with respect to
punishment.  Id.  The Court of Criminal Appeals held that counsel=s behavior,
considered as a whole, constructively denied appellant his right to effective
assistance of counsel because counsel Aeffectively
boycotted the trial proceedings and entirely failed to subject the prosecution=s case to
meaningful adversarial testing.@  Id. at 350-52.

Here, appellant=s trial counsel
did not refuse to participate during the proceedings or announce he was
unprepared to go forward.  Instead, the record reflects that appellant=s trial counsel
participated in all aspects of appellant=s trial.  Trial
counsel participated in jury selection, made opening and closing statements,
filed motions, made objections, cross-examined the State=s witnesses,
called defense witnesses, and requested special jury instructions.

Further, the record does not support
appellant=s assertion that his trial counsel was completely
unprepared.  The record shows that trial counsel knew that trial was scheduled
to begin on June 11, 2007.  As discussed in more detail in connection with
appellant=s fifth issue, trial counsel prepared a motion for
continuance regarding the June 11, 2007 trial setting by June 3, 2007.  Trial
counsel therefore knew no later than June 3, 2007 that trial was set for June
11, 2007.  Additionally, trial counsel acknowledged receiving a letter from the
State on April 27, 2007, in which the State asked trial counsel to set any
discovery hearing before the next trial setting on June 11, 2007.

Trial counsel was familiar enough with
both charging instruments to argue their contents before trial began.  Trial
counsel knew what the indictments in both causes alleged and complained about
not receiving 10 days= notice to plead to the re-indictment in
the securities fraud case C although he acknowledged receiving
service of the re-indictment on April 28, 2007.  Trial counsel also objected to
the State=s motion to amend the re-indictment for securities
fraud, and the trial court did not grant the amendment with respect to
securities fraud.  Trial counsel did not object to amending the indictment for
misapplication of fiduciary property. 








Appellant attended the June 4, 2007
pretrial hearing without counsel.   Trial counsel stated that he was unable to
attend the June 4 hearing due to a conflict, but he gave appellant a motion for
continuance to present to the trial court.  The State was also not present at
the June 4, 2007 pretrial hearing.  Trial counsel was also unable to attend a
previous pretrial hearing with appellant, but trial counsel stated that appellant
was not alone and was accompanied by the attorney who represented him in his Agambling case.@ 

Appellant claims that the Acourt had to tell
trial counsel to file a motion designating punishment option,@ referring to the
following exchange:

THE COURT: The clerk has a
question.  She wants to know if your client is eligible for probation and you
filed a motion for probation.

TRIAL COUNSEL: My client, I
believe, would be eligible, no prior convictions.

THE COURT: In order to get it, you
have to file a motion.

TRIAL
COUNSEL: We=re going to file it now with your kind assistance.

This exchange does not support appellant=s assertion when
viewed in the proper context.  The exchange does not indicate that trial
counsel did not know that he had to file a motion designating a punishment option. 
Rather, after trial counsel answered the clerk=s question, the
trial court simply stated that trial counsel needed to file a motion.  Nothing
in this exchange establishes that trial counsel did not know himself that he
needed to file a motion.  

Additionally, appellant incorrectly claims
that trial counsel admitted a number of times that he was not experienced in
criminal cases.  Appellant has not pointed to any record cite to support his
assertion, nor have we found any such statement made by trial counsel.








Lastly, appellant claims that trial
counsel Aadmitted his
ignorance regarding SIX bank accounts relating to Mr. Verkin and his
activities,@ and that this ignorance prevented trial counsel from
cross-examining Verkin to demonstrate where and how Verkin manipulated
Retriever funds.  The record does not reflect that trial counsel had any
difficulties cross-examining Verkin at trial.  Verkin himself admitted that he
used Retriever funds to pay for his personal expenditures and that Retriever
checks were written to his wife and son.  Financial analyst Sedwick confirmed
that 41 percent of Retriever funds went to Verkin personally, his companies,
his wife, or his son. 

Finally, appellant makes no effort to
explain how any of his trial counsel=s alleged
deficiencies prejudiced him.  For the foregoing reasons, we overrule appellant=s sixth issue.

E.      Attorney-Client Privilege

In his seventh issue, appellant argues
that the trial court erred by allowing Verkin to testify at trial because he
was appellant=s attorney. 

A client has a privilege to refuse to
disclose and to prevent any other person from disclosing confidential
communications made for the purpose of facilitating the rendition of
professional legal services. Tex. R. Evid. 503(b); Austin v. State, 934
S.W.2d 672, 673 (Tex. Crim. App. 1996).  Therefore, application of the attorney‑client
privilege depends on whether the communication sought to be protected is Aconfidential.@  Austin,
934 S.W.2d at 674.  A communication is Aconfidential@ if it is not
intended to be disclosed to third persons other than those to whom disclosure
is made in furtherance of the rendition of professional legal services to the
client.   Id.  The client bears the burden of establishing the existence
of the privilege.  Id.          

The attorney‑client privilege
promotes communication between attorney and client unrestrained by fear that
these confidences may later be revealed.  Id.  at 673.  Statements and
advice of the attorney are just as protected as the communications of the
client.  Id.  Attorneys may testify regarding information they possess
about a client so long as no communication is revealed.  Id.








Appellant contends on appeal that Athe case at bar
clearly involves an attorney-client relationship@ and that the
trial court erred in allowing Verkin to testify at trial.  However, appellant
presents only the following conclusory statement to support his issue: AAll of the
testimony provided by Mr. Verkin was in violation of the attorney-client
privilege and the admission of all such evidence was error.  Appellant prays
that the Court reverse his convictions on all counts and order a new trial.@

This conclusory statement is insufficient
to establish that all of Verkin=s testimony was inadmissible.  The record
contains nearly 200 pages of Verkin=s testimony
recorded over a two-day period.  Appellant makes no effort to explain what part
of Verkin=s testimony was based on communications that were
confidential and made for the purpose of facilitating the rendition of
professional legal services, and what part of Verkin=s testimony was
based simply on his unprivileged personal observations.  See Manning v.
State, 766 S.W.2d 551, 556 (Tex. App.CDallas
1989)(attorney=s testimony regarding observations he made did not
violate the attorney-client privilege), aff=d, 773 S.W.2d 568,
568-69 (Tex. Crim. App. 1989)(per curiam)(adopting court of appeal reasoning as
sound).  This conclusory assertion provides no basis for reversal.

Accordingly, we overrule appellant=s seventh issue.

Conclusion

Having overruled appellant=s issues presented
on appeal, we affirm appellant=s conviction for misapplication of
fiduciary property in cause number 14-07-00855-CR; and we affirm appellant=s conviction for
securities fraud in cause number 14-07-00856-CR. 

 

 

 

 

/s/      William
J. Boyce

Justice

 

Panel consists of Justices Frost, Brown, and Boyce.

Publish C Tex. R. App. P. 47.2(b).      

 

 









[1]  Verkin is variously identified in the appellate
record as William Verkin, Winford Evans Verkin, Jr.,W.E. Verkin, Jr., and
Wintford Evans Verkin, Jr.  Based on the signature on his plea agreement, we
conclude that his correct name is Wintford Evans Verkin, Jr.





[2]  Appellant does not complain on appeal that the State
failed to meet its burden to adequately corroborate accomplice-witness
testimony.  See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[3]  This trust appears to be an earlier established
trust that is not related to the GPT or JET trusts.





[4]  The Riney court also stated that it was not
overruling the part of Ward in which the Ward court concluded
that A>[n]either the motion [to amend] itself nor the trial
judge=s granting thereof is an amendment;  rather the two
comprise the authorization for the eventual amendment of the charging
instrument pursuant to Article 28.10.=@ Riney,
28 S.W.3d. at 566 (quoting Ward, 829 S.W.2d at 793).  We need not and do
not address whether the State=s written
motion to amend, containing the requested amending language, would be
sufficient to accomplish an amendment if the trial court had indicated in the
record that it granted the State=s
motion to amend.